Good morning, ladies and gentlemen. Our first case for argument is Eli Lilly and Company v. Becerra. Mr. O'Quinn. Thank you, Judge Easterbrook, and may it please the Court, John O'Quinn on behalf of Eli Lilly. This is a case about statutory interpretation, and in particular, the meaning of the words offer and purchased by. The government, however, says very little about the text of the statute while advancing a position that has transformed a cost-savings program for certain non-profit entities into the second-largest federal drug program. An exception to the Medicaid rebate statute is— Counsel, before we get into the merits, there are a number of questions, some jurisdictional and some bordering on jurisdictional, that I think we need to pursue. The first is whether the district court was entitled to enter a Rule 54B judgment. The Court's rules call for the litigants to explain the relation between the claims in the Rule 54B judgment and the claims remaining in the district court. That was not done by any of the briefs, so it's time to do it now. What is the relation between these claims that you're trying to appeal and the claims remaining in the district court? Judge Easterbrook, there's no relationship between the claims that remain in the district court and the claims that are presently at issue on appeal. No relationship? No relationship in the sense that we've challenged different final agency actions. That's part of the question. We will get to the question whether either the advisory opinion or the enforcement letter is final. But if I understand what's going on, the enforcement letter, if Eli Lilly's response is not favorable, would kick off a hearing process under the regulations that remain in the district court. No, respectfully, Judge Easterbrook, those are unrelated. The issue with respect to the hearing process in the administrative dispute resolution is a process that covered entities can invoke to have disputes about whether or not they have been overcharged, heard by a panel that's appointed by HRSA. It is not an issue that goes to whether or not HRSA can take enforcement action. If you would use real English words, that would help us. The briefs are full of acronyms and initialisms as if we were specialists in this field. We aren't. We're generalists. We deal in English. So if you would, that would help us. Sure. By HRSA, I'm referring to the specific entity within the Department of Health and Human Services. You can call it the agency. Let's just call it the government. No, it's not the government. We are as part of the government as the agency is. That is fair, Judge Easterbrook. Why don't you call it the agency? I'd be happy to do that. It's a sub-agency within the Department of Health and Human Services, but I agree we can refer to it as the agency. So what is at issue in this appeal is where the agency has taken enforcement action. The agency has, in the words of this court's decision in Western Illinois Home Health, reached the culmination of the agency's decision-making process, which is separate. You say it's the culmination. Maybe we need to pursue that. Exactly how much does Eli Lilly have to pay? Well, Judge Easterbrook, Eli Lilly has not been found to have to pay any particular amount of money. Exactly. Well, we're now getting there. It doesn't sound like the culmination of anything. What it sounded like to me when I read it is the kind of letter you get from a patent lawyer saying, you are infringing my client's patent. You must cease and desist immediately. That's not a final decision of any kind. That's a threat. So the agency issues a threat. A final decision would be something that said something like, Eli Lilly must reimburse the covered entities $43,635.27. But there isn't anything like that. Well, respectfully, Judge Easterbrook, I think that Justice Scalia's opinion for the court in Sackett v. EPA addressed this very type of issue, as did this court's opinion in Western Illinois Home Health. And there was no requirement to quantify what the liability might ultimately be. You have a definitive position by the agency. Look, counsel, we have the agency's definitive position, but we don't have a decision based on that. Think about my demand letter again. The patent holder has stated its final position about whether there is a valid and infringed patent. But that's not the end. It's just the beginning. Respectfully, Judge Easterbrook. I wish you'd stop saying respectfully. It sounds like if you weren't a judge, I'd like to punch you in the nose right now. Just answer the question. I certainly don't feel that way, Judge Easterbrook. Quite the contrary. I appreciate the court confirming that it has jurisdiction, as the court has the constitutional obligation to do. Now, whether or not the letter is final agency action is, of course, not itself ultimately a jurisdictional question. It goes to whether we have a cause of action. And the government has certainly waived any argument that the letter is not final. The government has at least forfeited. Well, in fact, it's gone further. The question whether it is final sounds like, well, unless you have some Supreme Court decision that a court of appeals cannot consider this if it's not raised by the parties, it sounds like an abstention question or a ripeness question on which the court can make its own decision. And let me tell you why I am worried about this. Normally, we try very hard to avoid advisory opinions. We need to have some underlying set of facts to which the law will be applied. But neither the advisory opinion nor the enforcement letter makes any findings of fact about what Eli Lilly is doing. And it sounds from the briefs like the parties don't agree on what Eli Lilly is doing. And that creates a big problem because if we state legal principles, they may turn out to be entirely abstract and inapplicable. And that's a problem for a court, something we try hard to avoid. Well, Judge Easterbrook, again, in addition to pointing you to the Supreme Court's decision in Sackett, I'd also point you to the Fourth Circuit's decision in Genesis Healthcare, which is cited in our reply brief. In terms of whether or not there's constitutional ripeness, I think there's no argument that there is not an actual live controversy between the parties, namely between us and the government as to what our statutory obligations are. And unlike the patent hypothetical, this is an agency that is making a determination that then has legal consequences for us. For example, it subjects us to a heightened risk of civil monetary penalties, and it subjects us now in a way that we couldn't previously have been able to remove from the program. Let me ask the question a different way. Suppose the agency were to file a lawsuit. Could it say in this lawsuit, Eli Lilly owes and then put in some number. Its liability has already been determined in the enforcement letter and is no longer subject to contest. Would that be a correct legal position? Judge Easterbrook, I don't think that because what the agency is engaged in here is an informal adjudication, I don't think that it would have collateral estoppel effects in the context of litigation. In other words, it wouldn't do squat, which suggests it's not final. Let me direct your attention to Army Corps of Engineers against Hawks, which was a jurisdictional determination by the Corps of Engineers. And the court said that was final because in any later litigation, it is not contestable. It's over and done. And when you answer my question about the enforcement letter by saying it is contestable, it's not over and done, it sounds like you've just taken it outside the court's rationale in Hawks. Well, I don't think I've taken it outside the court's rationale in Sackett, and I don't think I've taken it outside this court's rationale in Western Illinois Home Health. I think that you have a situation here where the agency unquestionably has, in plain terms, determined that Lilly's actions violate the statute. You see, that's the question. You're begging the question, counsel. The agency has firmly stated its view, but the question is whether firmly stating a view is the same thing as a legal determination. Agencies, for example, file briefs all the time firmly stating views, but those briefs aren't contestable as final agency action. They're just inputs into a final decision. Well, not a final decision by the agency. That's part of the principal difference. The filing of a brief in court is not agency action in the sense of the APA, and that's what we're addressing here is whether or not you have final agency action under the APA. And the government's position is that its violation letter now subjects us to penalties and the revocation of- But then I don't understand why you answered my question about litigation the way you did, by saying that the violation letter could just be put away and we will now contest that issue. If you had said, this is it, it's over, that would make it final. But if you say it's just like the lawyer's demand letter in patent litigation, it doesn't sound final. Well, I think the thing I'm struggling with with your hypothetical, Judge Easterbrook, is that there is no separate litigation along the lines that you are referring to. If the agency were to take further action, which itself would be new agency action, to revoke our Medicare participation or to impose civil monetary penalties, I think that would itself be a new action that would be subject- Because it would require your client to do something concrete and do it now. My client's been required by the agency to do something concrete and told that if it doesn't do the something concrete that it faces- Look, we're back to the demand letter. The demand letter says you must cease and desist right now from selling Product X. And if you don't, you'll owe us a lot of money. But we all agree that's not a final decision. Well, it may be a final decision by somebody. It's not agency action at all. I mean, your hypothetical doesn't map on to the circumstances that we're addressing. Suppose it's sent by an agency that holds a patent, if that's what you want. I don't know that that hypothetical exists either. But my point is, if you have the agency making a demand and telling you that this is what you must do, we have determined what your obligations are, and if you don't do them, it subjects you to the following consequences. I think that's final agency action. I don't think you're even seeing my problem. Obviously, I don't want to prevent you from arguing the merits. But this is a subject that since the briefs haven't covered, we will need to be covered with some care. So we will be directing the parties to file supplemental briefs about appellate jurisdiction, about whether the enforcement letter is a final agency action, and whether the advisory opinion is a final agency action. And I'm sure you'll want to discuss the Supreme Court's opinion in Hawks that I've cited, and you may want to discuss some other things too. We would, of course, be happy to submit supplemental briefing to the Court. Two questions for the Court on that. Number one, the advisory opinion has been vacated. The government has separately purported to withdraw it, and the government has not, as part of its cross-appeal, raised any issues with respect to the advisory opinion. Would you like us to address that, or would you like us to just address the violation letter? Just the violation letter. Oh, and by the way, just one final jurisdictional question. It's not really important since the agency has appealed, but I wonder how Eli Lilly can appeal. It seems to have won in the district court. Well, Judge Easterbrook, I would point you to pages 17 and 18 of the jurisdictional brief that we filed on November 30th of last year, where we did address this particular issue. We're happy to address that again in the supplemental briefing that Your Honor has requested. But this is a case where, number one, you now have the district court having entered a declaratory judgment that is on its terms adverse to us. It is found against Eli Lilly and specifically said that the statute, quote, does not permit drug manufacturers such as plaintiffs to impose unilateral extra statutory restrictions on their offer to sell 340B drugs to covered entities, end quote. And that's in page 71 of the short appendix. So there is an adverse aspect of the district court's judgment to us, and what we have sought in our appeal is to expand the basis for relief. But we will certainly address that in the briefing as well. Good. We will look forward to that. And can we expect an order that will set a timeline, or is that something that you would like to address here? I will say 14 days. OK. If you think you need more time, let us know. Thank you, Judge Easterbrook. I'll certainly confer with the government's counsel on that, and we will, you know, otherwise respond promptly within 14 days. Mm-hmm. And would you like the briefs to be filed at the same time? Yes. OK. So assuming the court does reach the merits, the government would force, by its decision in the violation letter, manufacturers to continue to transfer billions of dollars to massive for-profit retail pharmacies under the guise of dubious relationships that the statute does not say a word about, and the statute does not require the manufacturers to facilitate this kabuki. Indeed, as the district court here and every other court to address the issue has recognized, and even the government concedes, the 340B statute is entirely silent as to contract pharmacies and drug delivery. The only obligation that the statute puts on manufacturers, and this is the issue that is joined in the violation letter, is whether it is enough for us to offer drugs that are for purchase by covered entities at the ceiling price. That is all the statute requires. But, counsel, when Congress enacted the statutes at the time, we assumed that it was aware of the industry practice, which was that a very small majority of or a very small percentage of covered entities actually had in-house pharmacies. Right? And so wouldn't we think that when Congress used broad language, it took the state of the industry into account? So, Judge Lee, I think that when Congress enacted the statute that it did, I don't think that the record reflects that Congress was aware that covered entities did not have a number of contract pharmacies. Okay. Well, what about the amendment then, certainly by the time of the amendment? Well, contemporaneous with the 2010 amendment is the time that the agency was revisiting its guidance. But until 2010, the agency's position was that covered entities could use one and only one contract pharmacy. And if you go back to 1996, the agency's own narrative was that it, quote, became apparent that they subsequently realized that covered entities did not have, many of them did not have contract pharmacies. Now, I freely admit, and our brief makes this point clear, that Lilly and manufacturers are required to make a bona fide offer. That is that the offer can't be something that is purely elusive. How is that supposed to be determined? How is a bona fide offer supposed to be determined, and who is supposed to determine that? Because you would say limiting it to one contract pharmacy is a bona fide offer, and the government would say, no, no, no. You have to limit it or offer it to every outside pharmacy. So how do we determine that? So, Judge St. Eve, I think ours is the easy case for determining that it's a bona fide offer, given the history here. That is, for the first, really, 18 years of the program, but certainly for 15 years of the agency's guidance, the covered entities were limited to one and only one contract pharmacy. And I don't think you can then say that it's not a bona fide offer under the— Why not, given the change in the factual circumstances and given the change in the industry? So, Judge St. Eve, first of all, I don't know that there is a change in factual circumstances that makes a difference here. Well, I certainly think the record supports that there is a significant change in the number of outside pharmacies or contract pharmacies. That's what I mean by a factual change. Absolutely. I mean, so as a result of HRSA's change in guidance in 2010, you're absolutely right. There has been an explosion in terms of contract pharmacies. And the relationship in order to facilitate that explosion is one where it's an honest question as to whether or not purchases are even being made by covered entities, as opposed to being made by the contract pharmacies themselves. And that's a separate question than the bona fide. So my question to you is in the realities of the world with 340B pricing now and the number of outside pharmacies or contract pharmacies that are used, how is bona fide offer supposed to be determined? Is it a legal question? Is it a factual question? Is it something we should look to the legislative history for since the statute doesn't answer it? Is it something we should look to general contract principles for? I know I'm throwing a lot of questions at you, but give us some help on how you determine bona fide. No, I appreciate the question, Judge St. Eve. And ultimately, I think it is something that would be determined on a case-by-case basis. I mean, there are a number of statutory schemes that exist that require parties to make offers, and some of those in various contexts. For example, in the context of rights of first refusal, in the context of franchisor-franchisee relationships. So if what you say is accurate, it has to be determined on a case-by-case basis, why wouldn't that run in direct conflict to what the Supreme Court said in Astra USA? They seemed – I know it was a covered entity suing there, but they specifically said, this is not what we want, all of these decisions being made on a case-by-case basis. So, Judge St. Eve, I think what the Supreme Court was dealing with in Astra was the fact that there wasn't a private right of action, and you couldn't get it under the statute. And so the covered entities didn't have – just as they didn't have a private right of action under the statute, they also didn't have a private right of action under the agreement between the manufacturers and the government. But that's a different – and I agree with you that the statutory regime certainly limits, for example, manufacturers' ability to take an action against a covered entity for not complying with its statutory obligations. But that's a different question than the question of what are those statutory obligations in the first place, and here we have a live dispute with the government, with the government on threat of penalty, taking the position that we are required to deliver to an unlimited number of contract pharmacies. And I think it's very telling that in enacting this statute, Congress did not give the agency rulemaking authority. And so what the government has done through its guidance is to suggest that it can change the situation on the ground. But at the end of the day, they can't change the statutory obligation, which is – So if the statutory obligation is a bona fide offer, if that's the application, how do we determine and come up with principles for what's bona fide? Sure. I think there are a number of analogies that one could look to. So, for example, if you're asking the question of whether or not insurance coverage is illusory, you would ask is it unavailable under any reasonably expected set of circumstances. So you're looking more to contractual or business-type relationships rather than the legislative history here. I think that's right, Judge St. Eve, because that is the backdrop against which Congress was legislating. Congress was legislating against the common law. The common law background, for example, would inform both what the obligation is and what it is not. But, counsel, if you are basically asking us to read in or write in another term in the statute, why isn't that something that you should ask Congress to do? After all, when Congress wrote the statute, it wrote it rather broadly, and the industry has changed, right? And so you're saying because the industry and circumstances of the world have changed, the statute doesn't quite address all of the different permutations of relationships and the new issues that have arisen. That seems to me like the archetypical example of people then going back to Congress and saying that Congress has to amend the statute rather than having us as judges sit here, read something into the statute that isn't there, at least not plainly. Judge Lee, I'm not asking you to read anything into the statute. The question before you is just how do you interpret the word offer and purchase by? And I think it's commonly recognized that for an offer to actually be an offer, that it can't be an illusory offer. But at the end of the day, it is the government and the covered entities that are seeking to impose non-statutory delivery obligations on us. The fact that Congress adopted this against the backdrop of the common law means that Congress had to understand that there are all kinds of terms that parties will enter into in deciding how they're going to actually fulfill their obligation. Does your client sell drugs to other entities that use contract pharmacies outside the 340B program? There's nothing analogous to the 340B program, Judge Lee. This is sui generis. So is the answer to my question that no, your client does not sell drugs to entities that use contract pharmacies? As far as I'm aware, the commercial sales that my client makes are not to things that would look like covered entities, I mean like contract pharmacies, because there's nobody else for whom this sort of ship-to, bill-to arrangement that the agency came up with on its own, despite not having rulemaking authority, which I think, again, is very telling here. I mean the backdrop against which this was enacted is the Supreme Court's admonition in Christensen, which is unless there is a prohibition on private parties, that there's not a restriction on those private parties arranging their affairs the way that they otherwise would arrange them to. To follow up on Judge Lee's question, so Eli Lilly doesn't sell to any health care entities and have distribution agreements with those health care entities to deliver drugs to CVS, Walgreens, et cetera? I'm not aware of anything that resembles what's at issue here. And there's certainly nothing that Eli Lilly does that involves the prevailing replenishment model, where what is happening is that without the ostensible purchaser even knowing that the purchase is made, never actually taking any meaningful title to the drug, not even knowing that it has been received, that it all happens on the back end, and that the drugs are themselves arbitrage sold to whoever it is that comes in, and also overwhelmingly sold at full price to the patients that ultimately the 340B program was supposed to help. I mean the contemporaneous— What's your best evidence of that? It wasn't clear in the record. I know some of the amici addressed that, but it wasn't clear that that evidence was put in the record or that a factual finding was made on that. Well, Judge St. Eve, I mean there are limitations here to the administrative record given the process that the government used in order to issue the violation letter in the first place and the limits on that. I would point you to a couple of places. If you look at page 14 of our opening brief and material from the Pioneer Institute that we cite, I'd point you also to the Community Oncology Alliance's amicus brief. Right. It's in the amica. I understand it. It addresses a number of this. And I would also point you, both parties, amici, refer to studies by an entity called IQVIA, I-Q-V-I-A. It's a respected healthcare data analysis firm, and it found that less than 1.5% of patients were getting discounts. Is that something that needs factual development on for us to make this determination? I was just about to say, I don't think that this ultimately colors the issue of statutory interpretation. Congress put one and only one obligation on manufacturers, and that is to offer it for sale at the ceiling price. And we do that. It doesn't matter if somebody has lots of contract pharmacy arrangements. We will sell to them directly for delivery, either to them or to a single contract pharmacy, if they don't have their own in-house pharmacy, whatever their other relationships might be. I see that I've got about two minutes of time remaining. I'm happy to continue answering questions, but I did want to save a little bit of time for rebuttal. Certainly, counsel. Thank you, Judge Easterbrook. Ms. Kline. You may please the court. I just want to touch briefly on the final agency action rightness issue because I struggled with this. We actually need to start with the question of appellate jurisdiction. Then we'll get to final agency action. So for our appeal, the enforcement action was blocked. We can't go forward, and so as we see it, even though the district court said a lot of things that we think are correct, the bottom line was we can't proceed. The appellate jurisdiction question is whether this is a proper Rule 54B judgment, which depends on the relation between what is covered by the Rule 54B judgment and what remains undecided in the district court. So what remains undecided, ultimately, is a challenge to the regulation that established the administrative dispute resolution process. And as counsel noted, that is not the process that's directly at issue here. We think that is the process that's properly used, but that's not what we're here because there was the start of an enforcement action and the district court vacated it. So at the moment, the agency's hands are tied. As Mr. O'Quinn described the regulation, it is one that can be invoked only by a covered entity and not by the agency. What is your understanding? That's incorrect. The statute makes clear the way if a manufacturer has an issue, it's supposed to conduct an audit at its own expense. This is all the statute. Audit at the manufacturer's expense, which is a prerequisite to then bringing its concern, its complaint to the agency through the administrative dispute resolution process. And that's subject to judicial review. Then what it sounds like is that if Eli Lilly says, Dear agency, thank you very much. We've received your enforcement letter. It is well printed, but we have no intention of doing anything about it. What happens next? It can be referred to the Office of Inspector General that can assess civil monetary penalties, but Your Honor is correct that nothing is foreclosed in terms of judicial review. That can be challenged through judicial review. Does it go into this regulatory process that is still, the validity of which is still pending in the district court, that is the administrative dispute resolution regulation? That's not the exclusive means of an enforcement action. It's not the exclusive means. So it's not inevitable. There could be other means of doing. Yes. But as I was trying to explain to Mr. Quinn, that leads to my problem. It looks like the enforcement letter is a step toward a final decision, but is not itself the final decision. Your Honor is correct, but I'm also going to explain why, even though we normally make rightness final agency action arguments, we did not think it was correct to say there was nothing that Eli Lilly could bring to the district court. And here's the position they took before the agency, which is at page 129 of our supplemental appendix, is there is zero right to proceed with an enforcement action because honoring any contract pharmacy arrangement is a matter of grace for us, and indeed contract pharmacy transactions are diversion. So they took a legal position that in the Abbott Labs sense, if they were correct, would mean- Abbott Laboratories has nothing to do with this case. I appreciate that was a regulation. It's a reinforcement review of a regulation. I appreciate that was a regulation. I'm just making the point that the concerns animating Abbott Labs, which was does the challenger have to bet the farm or can it get heard earlier? Don't go into Abbott Labs. It's irrelevant. The controlling Supreme Court decision, as best I can figure out, in the absence of any help from the parties, is Army Corps of Engineers against Hawk's Company. Nobody discusses that, and we need the parties' presentations on what the consequences of that are. But Abbott Laboratories just is a totally different problem. Well, we understand we'll be filing supplemental briefs. But to address the legal issue that was the argument that Eli made for stopping the enforcement action in its tracks, that argument was dealing with contract pharmacies is a matter of grace, that our only obligation is to ship directly to the covered entity, and that if a covered entity decides to rely on one or more contract pharmacies, there's no entitlement to the discount. And to understand why that's incorrect, which is at the point the district court addressed at length, you have to look at the provisions of the statute as a whole, and that includes both the provision that was being discussed earlier. I'm really not sure we're done yet. Oh, I understood we were filing supplemental briefs. Yes, you are, but I just want to make sure that everybody understands what's bugging me at least and perhaps bugging my colleagues. First, it seems to me there is a relation between this enforcement letter and the what's the name of it again? The Administrative Dispute Resolution. The Administrative Dispute Resolution regulation. That relation, if the agency itself or if Lilly can initiate that process, that might well be good evidence that the enforcement letter is not itself the final decision, but a step toward it. It has the further consequence of raising the question whether the Rule 54B partial final judgment is proper because that procedure is supposed to be used for completely discreet segments of the litigation, and the enforcement letter may not be discreet from the dispute resolution, et cetera. So when these supplemental memos are filed, they need to address the relation between the enforcement letter and the regulation and possible litigation, both in terms of Rule 54B and in terms of whether there's a final decision, final agency action. They are in some ways distinct but also potentially related. Yes. But again, while we're here, just because the agency can sua sponte initiate an enforcement action, as it could do before these 2010 amendments and before the regulation that governs the administrative dispute process was out, that's what we actually have before the court, which was an agency-initiated enforcement action. It did not reach a conclusion about how many overcharges or what the penalty should be, but there was an agency-initiated enforcement action that was based on the fact that covered entities filed all those spreadsheets in our supplemental appendix or itemized examples of we can't get the Eli Lilly drug at the discount. And so what the agency said in the enforcement letter that's before the court was based on our view of these covered entity complaints and your policies that are the source of those complaints, we see a violation of the statute that can result in three times penalty. Counsel, let me tell you one other thing that's bugging me, and this is more substantive. Both parties are relying on the language of the statute and saying it's all perfectly straightforward. Whenever both sides say, oh, just rely on the language of the statute, it's straightforward, and they come to completely opposite conclusions, I get worried, right? I wonder if there is some play in the joints. And we've explored with Mr. O'Quinn the question whether good faith offer is play in the joints. I'm actually worried about the word to in the statute. You have to make the good faith offer to a covered entity. And Lilly says we are making a perfectly good faith offer to the covered entities, and if you look through the list of something like 15 covered entities, contract pharmacies aren't on the list, right? A covered entity wants us to make an offer to and deliver to some non-covered entity as its agent. Well, whether an agent is included as a covered entity strikes me as an interesting question, which one can't answer by staring at the statute. Has the agency ever made a decision that looks like an exercise of administrative discretion that would be covered by Chevron? I mean, I'm struck by the fact that the enforcement letter just says, oh, this is perfectly clear, and it's so clear we don't even have to give reasons, right? And Lilly says it's perfectly clear. And as I say, the other way of saying that is when I hear that from both sides, I start thinking about administrative discretion. You're not relying on Chevron here. Has the agency made a discretionary decision someplace else that we should look to? We're not relying on Chevron deference, period. Again, I don't know if the court listened to the details. Anywhere else either? It's common ground. There's no delegation to the agency. This is just the court. There are ambiguous terms in a statute, right? agents of the covered entities may not. You can't rely on Chevron because there's no rule or administrative adjudication. In an administrative adjudication, the agency could rely on Chevron. I mean, that's the holding of Meade. We have not contested the fairly well-recognized proposition that the agency has no delegated authority to address these contract pharmacy arrangements. That's why the agency said from the get-go, they used the word suggestions in the 1996 guidance in saying to covered entities, these are the model contract provisions that we're suggesting. And as Judge Katza said last week, that just means if the government's position is more persuasive, you know, 51% to 49%, the government wins. If the court thinks the opposite, the other side wins. But we're not here talking about ambiguity or lack of ambiguity. We're just saying using all of the tools in the statutory toolkit, which means not looking just at that offer provision but reading the rest of the statute and understanding that relying on an outside pharmacy was customary when the statute was enacted. Congress was aware of it. It was relying on a pharmacy is necessary to distribute prescription drugs because of other background state law and federal law constraints. So the question that we think is properly before the court is, is Eli Lilly correct when they say we could refuse flat out to ship to a single contract pharmacy? And that is, we have argued, not correct when you use all the tools of statutory interpretation, including looking to the provisions that are directed at covered entities. Because this is actually where when the agency was talking about silence, this is what it was saying. It said, what does the statute say? The statute says covered entity has to be the purchaser, and covered entity cannot engage in diversion or duplicate discounts. And diversion, if you look at the statutory provision that's at the top of page 5 of the addendum to our brief, that's about the patients. When you reconcile the books, when you net it out, every unit of drug bought at a discount has to map on to a unit of drug that was dispensed to a patient of the covered entity. That's the covered entity's obligation. If the covered entity didn't do that, it engaged in diversion, and it's going to owe money to the manufacturer. It could owe penalties. It could get kicked out of the program. But what Congress did not say to the covered entity, again, this is the silence point the agency was making through informal guidance, was you can't use the standard intermediaries to get the drug from the manufacturer to the patient. And when you understand that the point of this program was to allow covered entities that are serving rural populations, other underserved populations, to actually do so for the patients, then it is just not tenable to say, I, Eli Lilly, or some other manufacturer, refuse flat out to ship to the pharmacies that are the essential intermediary in order to get the drugs to the patients themselves.  What if the covered entity says, we want you to ship to 100 different contract pharmacies? There are not limits in terms of, like, the plaintiffs aren't saying we don't ship to Walgreens. We don't ship to CVS. So we're not talking about, there would be limits if we said we're not here defending the ship to the moon. But that's a different question. No, that's a different question than from the government's view, are there limits on what the manufacturer could say when it makes an offer? No, not on the number of outside pharmacies, contract pharmacies. There's nothing in the tax. That would be if Congress saw fit to give the agency rulemaking authority, which the agency has now asked for every year, I think since fiscal year 2017. So the agency has said that manufacturers can require covered entities to meet other commercial requirements, like setting up an account, et cetera. How do you distinguish between the two? Why are they allowed to put some commercial restrictions or some commercial requirements on but not other requirements? So all the agency said was you can require the routine business information that's necessary to make this whole system work, like what's your billing address? I mean, that would have been obvious, I think, even if the agency hadn't said it. That's nothing like saying even though Congress didn't restrict the covered entities' use of outside pharmacies, it had a bill before it that would have done so, and it didn't enact that, so it was clearly aware that covered entities were using the outside pharmacies. Even though Congress didn't do that, Congress essentially delegated to the manufacturer the ability to say we'll only do five or only within 40 miles or, you know, all the permutations that the different manufacturers have offered. And that's not – there's nothing in the text that suggests that that was left to the discretion of the manufacturers, and we've seen in practice that reduced sales at the discounted price by 89%, you know, almost 90%. So the argument that because Congress didn't explicitly speak to intermediaries in the statute, it just proves too much. It's not a reasonable inference using the normal tools in the statutory toolkit, no Chevron deference, just regular interpretation to say, therefore, you can treat shipping to an outside pharmacy as a matter of grace. Now, I want to explain where the agencies – what gets incorrectly described as the agency-limited covered entities to just one for a period of years, between 1996 and 2001. And it's important to be precise about that. The agency has always recognized it doesn't have regulatory authority in this area. In 1994, in the guidance that we've cited in the brief, the agency said – there was a comment that said manufacturers shouldn't have to ship to contract pharmacies, and the agency said, no, that's not right. Covered entities like, you know, various other providers rely on outside pharmacies to get drugs to patients, and that's not a basis for manufacturers to withhold the discount. In 1996, what the agency said was, we're hearing lots of concerns from manufacturers that using these outside pharmacies might result in diversion, meaning real diversion, like the product ends up in the hands of somebody, not the patient of the covered entity, or duplicate discounts. And the agency said, we're going to study that, and we're going to do audits. And they said, meanwhile, covered entities, basically best practice is just limit yourself to one while we do this study. Not enforceable against the covered entity, because they could only enforce the statute. But that was basically what they said, and if you read the guidance, you know, carefully, you see their suggested model provisions, non-binding guidance. Come 2001, the agency said, you know, we're not seeing a problem, so we're going to start having, you know, see what we find when there are more contract pharmacies being used. And there were audits in 2001, 2002, all the way through 2006. Then in 2007, the agency issued proposed new guidance and said, we're still not seeing a problem, so we're going to lift our informal restriction that says you can only do one. That gets finalized in 2010, right before the Affordable Care Act is passed. Again, the narrative is important to understand, but none of it was actually binding on covered entities. The only thing that bound covered entities was thou shall not divert, and thou shall not allow duplicate discounts. And if the covered entities weren't keeping records that showed they were binding by those two principles, the covered entities weren't. You've gotten us to 2006. Any recent audits? So, okay, I think I got us to 2010, which is right before the Affordable Care Act is passed. Now, the last audit you mentioned was 2006. Have there been any recent audits? Yes, and they're discussed in the GAO reports. Discussing what? The audits. Yes. Yes. And, again, other than some issues around the margins, like what happens if a patient sees a doctor who both works at the clinic but also has a private practice, and, you know, how, like, does it work there? I'm just being simple. When is the most recent audit of the contract pharmacies? So I'm just telling the court what's in the public domain, but as far as I know, the GAO's 2020 report describes the audits that, as of that time, have been done for the past, I think, five or six years. The what 2020 report? The GAO's. Could you use English words, please? I assume you mean the Government Accounting Office. Yes. But maybe I'm wrong about that. I might have gotten it wrong, but, yes, at one point it was the Government Accountability Office, and then it was the Government Accounting Office, and maybe vice versa, and I don't recall when its name changed, and we all say GAO, so I apologize. But what in the briefs, unhelpfully I realize because it's an acronym we call the GAO. I know. The briefs are full of acronyms, and I've already explained why that makes life very hard on generalists. I agree, and I try to scrub my briefs. My next question is what happens if the pharmaceutical manufacturer disagrees with a conclusion about the extent to which drugs are being diverted, the extent to which there's arbitrage? Could Lily say to some covered entity, we think that the needs for your patients in a given year are quantity X, and we will ship X to you or your contract pharmacy, but we won't ship more than X. What happens? How can a dispute be resolved? Okay, no, and here's why, and this is going back to the text. No, no, no, look, listen carefully to my question. How can the dispute be resolved is my question. Yes, that's what I was about to say, and this is, again, statutory text. I just want to make sure we're all on the same page here. The statutory text says, Lily, audit the books of the covered entity at your expense, Lily's expense, and that is a prerequisite to going through the administrative dispute process, which is where Lily takes its documentation, if it actually does the audit and finds diversion, and says there's a problem, and at that point, Congress set out the scheme. There is an obligation for the covered, if proven, the covered entity has to do refunds plus penalties to Lily. It can owe penalties to the government, and it can be removed from the program. But that's not an exclusive remedy, correct? That's exclusive for the manufacturer. It's not, so the agency has sua sponte enforcement. What I hear you saying is if the hospital demands the agency that Lily deliver 100 times the plausible amount of a drug that its patients could use, that Lily must deliver the whole amount demanded and then demand a refund for 99% of what it delivers. Yes. What in the statute says that? This is related to the aster point. It's the flip side, as Judge St. Ives was pointing out. Everything like this, the disputes between the covered entity and the manufacturer, gets funneled through the agency. So at the back end, if they convince the agency that they're owed 99%, they get all that back. If they don't convince the agency, they can go to court. Maybe my question is obscure, but I meant it to be plain. My question is what in the statute says what you are telling us? You're telling us that Lily must deliver every single pill that's demanded, even if it's crystal clear that that demand is way out of line to actual needs, and then hope that the agency will order a refund. And my question was, what in the statute says that? It is the inference from the fact that Congress gave— In other words, nothing in the statute says that. No, it is in the statute. It's just like, okay, last term, the Supreme Court had a 340B case, and it said to the agency, look, you have a means survey if you want to reduce Medicare payment to covered entities. And what it said was, by negative inference, you can't do it without a survey. Same structure here. Congress said to the manufacturer, you can't do self-help. Could you tell me what section of the statute you think supports this inference? The audit provision followed by the remedies that the agency can impose if it finds a violation, which is, of course, subject to judicial review. You would agree, though— But you're not going to tell me what section of the statute that is. I can pull it out, but— I would really appreciate that. So in our addendum, if you go to page 5, that second big paragraph, auditing, that's been in there from the start, since 1992, and that's if the manufacturer thinks there's a problem, it audits the covered entities' books at the manufacturer's expense. And Asher explained there was long and informal dispute resolution process that the manufacturer could then, or the covered entity, could go to HHS and say, we see a problem. That was made much more formal by the Affordable Care Act's amendments, which said to the agency, issue regulations that establish this formal— Do you agree, though, that nothing says this is an exclusive remedy for the manufacturer? We agree that, but that was also true last term. Nothing said the survey was the exclusive means for HHS to adjust its compensation for 340B drugs. And the Supreme Court, unanimously, in rejecting our position, had no trouble saying, yes, of course it's exclusive, because, like, why have this calibrated scheme if, in fact, you could just do it a totally different way? And here, the manufacturer's argument is essentially, I can just engage in self-help. I can, at the front end, say, I'm not proving it, but I suspect diversion or duplicate discounts, so therefore I'm shutting down, you know, 89% of my discounted drug sales. Do you think Astra USA has an impact on what we can do? I want to make sure I understand. So the Supreme Court's reasoning? Yes. Well, we were thinking of it as really bearing on the merits, which is that manufacturers don't get to decide in a one-off way how they're going to deal with diversion and, like, have that then go through courts to decide what a bona fide offer is or isn't. Like, we don't see that as workable. We see the scheme that Congress put in as, you know, which is what the Supreme Court referred to in Astra is, no, everything goes through the agency, and then the ultimate decision by the agency is what gets subject to judicial review. So I realize, like, I might be talking myself into thinking I should have argued that there was no final agency action, but, again, I thought about this, and I felt uncomfortable saying that Eli Lilly can't get in the door at this stage with the extreme proposition that we don't have to deal with contract pharmacies, period. That seemed like something they could raise earlier rather than at the very end. Maybe I was wrong about that, and we will, you know, we'll address it, and the court can always say we forfeited it. But, again, it's not that we didn't think about it. We were thinking about whether this was the type of pure legal argument that they could raise at an early stage rather than at the end of the complete administrative process. So I see my time is almost up, and I just want to make sure. By the way, in light of Judge St. Eve's question, I hadn't focused on this, but I wonder what you think is the relation between this case and Talevsky pending in the Supreme Court, going to be argued next week, which says that spending clause legislation, I mean, that the argument in Talevsky is that spending clause legislation has to be enforced by revoking the spending and not by all of this independent litigation. So I trust the court is familiar with our amicus brief, which takes issue with that proposition. I'm aware of the Solicitor General's brief in that case. The question in light of Judge St. Eve's question is what happens if the Supreme Court in Talevsky accepts the view being taken by the private litigant rather than the view being taken by the Solicitor General? What happens to this case? So if this is a proper APA case, nothing, because even the issue that the Supreme Court had in Armstrong about whether you could bring a separate private cause of action to enforce parts of the Medicaid statute, that was – no one disputed that if you had an APA claim against the agency for approving the state's Medicaid rates, that you could bring it. So I think this just – I don't think Talevsky adds anything. I think the hard question is the one that Your Honor started with, which is that is there something ripe enough that the agency's basically statement, cease and desist from these policies because they're in violation of the statute? Is that ripe enough? And again, to be honest, we thought that seems ripe enough for Eli Lilly to bring its extreme legal argument to the district court and to this court, which is just that no – zero contract pharmacies, any use of contract pharmacies is diversion. Unless the court has questions, I'll cede my 48 seconds. The court welcomes the 48 seconds. I knew you were – got a long day ahead. Thank you, Ms. Klein. Thank you. Mr. Arquin, anything further? Mr. Easterbrook. Thank you, Judge Easterbrook. As I said at the outset, this case comes down to the statutory requirement to offer to covered entities for purchase at the ceiling price. And our – respectfully to the government, it's not that they are saying that that text answers the question. In fact, they agree about contract pharmacies. In fact, they've agreed at various points in time that contract pharmacies are not addressed in the statute. Rather, we are the ones who are saying that there is a simple statutory obligation that has one and only one obligation, which is the price. Well, look, if I were representing the agency, I would just point to the restatement of agency, different agency, right, and say something like, it is a perfectly ordinary rule of normal contract law that people can deal through agents. And so here you have a statutory requirement that you make a bona fide offer to, and then there's a list of 15, and they want to deal through agents. I mean, isn't that perfectly normal in American law? Well, first of all, the issue is that doesn't resolve what our obligation is in terms of where we have to deliver it. What they want us to do is to facilitate their expansive relationships with contract pharmacies in a way that the statute doesn't address. And if Congress wants to amend the statute, so be it. But their position relies on inferences. And, in fact, their bank shot inference that she proposed is from the audit provision, which is no basis to think that Congress created the second largest drug program, a program that the agency Aren't you relying on an inference as well, though, the bona fide? Well, no, I don't think so. Because that's not in the plain text of the statute. Well, the question is, what does it mean to make an offer? And I think the court would have to decide that question. But it's deciding it against the backdrop of the Supreme Court's decision in Christensen, which makes it clear that unless it's prohibited, the baseline is that we're free to provide our own conditions. I hope you heard my question. Why don't we use the restatement of agency as the baseline? Well, Judge Easterbrook, you potentially could. The government has, I would say the agency, but I don't want us to get confused on which one in this context, has abandoned that argument. That was the rationale of the advisory opinion. There's a reason they withdrew the advisory opinion. They're not relying on it. And that reason is these relationships with contract pharmacies can't possibly be viewed as being agency relationships when the principal has no idea what is happening and doesn't take and maintain title. And if I may, two last points, and I know that I'm past my time. One is there was a lot of revisionist history that was offered at the podium today about the 1996 guidance and the way that things operated, which, of course, is worded in the language of permission. But one of the things in those guidance documents was a requirement that the covered entities maintain title. And that is not happening in the fictional relationships that exist now. And then the last point, Judge Easterbrook, and we'll address this in the supplemental briefing, but the administrative dispute resolution process is not a process between manufacturers and the government. It's not between the government and covered entities. It runs both ways, but it's only between covered entities and manufacturers. Yes, you need to address that in the supplemental memos. Absolutely. The court directs the parties to file, within 14 days, supplemental memos addressing jurisdiction of this court under Rule 54B, which may depend on the relation between what's been resolved and the dispute resolution regulation, that addresses whether the enforcement letter is final agency decision, addresses the bearing of the Supreme Court's decision in Corps of Engineers against Hawks, and any of the related questions that we've been talking about. And if you want, I will give you leave to give us your views on the potential bearing of Talevsky, which may or may not turn out to be important, depending, of course, on what the Supreme Court says. And that, well, the future lies ahead. Well, Judge Easterbrook, I don't know that that would ultimately be relevant here. I think that the Supreme Court's decision— You can give us your views in the supplemental memos. We will do so. Okay. Thank you, Judge Easterbrook. Thank you very much. This case will be taken under advisement when the supplemental memos are received, and we'll now have a brief recess before calling the second case.